[Civ. No. 14913.   First Dist., Div. Two.   Apr. 2, 1952.]

J. B. CORRIE, Appellant, v. COUNTY OF CONTRA COSTA et al., Respondents.

A. F. Bray, Jr. for Appellant.

Francis W. Collins, District Attorney, and Charles L. Hemmings, Deputy District Attorney, for Respondents.

GOODELL, J.—The 1949 Legislature enacted the "Alternative method of distribution of tax levies and collections and of tax sale proceeds" (Stats. 1949, ch. 1370, p. 2386; Rev. & Tax. Code, §§ 4701-4716).   Its purpose as section 4701 declares is "to provide an alternative procedure for the distribution of property tax levies on the secured roll made by counties on their own behalf or as the tax-levying and tax-collecting agency for other political subdivisions" and "to accomplish a simplification of the tax-levying and tax-apportioning process and an increased flexibility in the use of available cash resources."

The Board of Supervisors of Contra Costa County by resolution declared its intention to adopt the new system where-

upon appellant commenced this taxpayer's suit, contending that the new law is in conflict with section 31 of article IV and section 18 of article XI of the Constitution, and therefore void. The court held otherwise and this appeal was taken.

Section 31 of article IV provides:

"The legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the state, or of any county . . . or other political corporation or subdivision of the state . . . in aid of or to any person, association, or corporation, whether municipal or otherwise, or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; . . ."

Appellant contends that the new system conflicts with section 31 since it "allows a credit to a political subdivision of the full amount of its tax assessments". and permits such subdivision "to expend the amount of the assessments before any such taxes are collected." Appellant says by way of illustration: "Thus a political body, such as a school district, is given full credit before any tax is actually collected, and such body will draw on and receive county moneys before they are actually collected from taxes."

The principal legal question is whether such action runs counter to the Constitution, and the principal practical question is whether there is any more danger of loss to the county and its taxpayers under the new system than under the old.

"All tax liens attach annually as of noon on the first Monday in March preceding the fiscal year for which the taxes are levied" (Rev. & Tax. Code, § 2192) and "Every lien . . . has the effect of an execution duly levied against the property subject to the lien" (§ 2193 id.).

After the board of supervisors fixes the tax rate (§ 2151 id.) it becomes the duty of the auditor to compute "in dollars and cents," and to otherwise make up, the tax roll (§ 2152 id.). This completion of the tax roll occurs about the end of August. Thus there comes into existence a complete showing of all taxes collectible for the current year, which are then a lien against all the property in the county subject to taxation.

Section 4705, Revenue and Taxation Code, one of the new sections, reads in part as follows: "Upon completion of the tax roll as prescribed by Section 2152 of this code the county auditor shall determine the total amount of taxes actually extended thereon for each fund for which a tax levy has been

included.   The amount so determined for each fund shall forthwith be apportioned to the credit of such funds on the accounts of the county auditor and county treasurer and the total thereof shall be entered on the accounts of both officers as a charge to the tax resources account 'tax collector— uncollected current taxes.' ''

Under the old system there is no such apportionment until the taxes are actually collected, but there is nothing in the Constitution prohibiting such action (which after all is simply a matter of bookkeeping entries) even though it occurs several months before collections start in November.   However, section 4705 goes on to say that ''The board of supervisors shall provide which moneys in the county treasury . . . shall be available to be drawn on to the extent of the amount of uncollected taxes credited to each fund for which a tax levy has been included, and *such moneys may thereafter be drawn against* in an amount not to exceed the amount of uncollected taxes credited to each fund for which a tax levy has been included *in the same manner as if the amount credited had been collected.*''   (Italics added.)

This means that such advances may be made to the districts and political subdivisions in September, some weeks before the tax money starts to come in.

The immediate and pressing financial needs and requirements of many of the political subdivisions or revenue districts cannot wait upon the actual collection of taxes starting in November and running into April.   School districts, where the monthly payrolls of teachers must be met, are a good example.

There is nothing new about this problem.   The Constitution itself recognizes it (art. IV, § 31, *supra*) and section 3719, Political Code, provides one method of meeting it.   However, respondents do not claim that the new sections derive their authority from section 31, of article IV.   They stand on the proposition that under the new system ''There is no lending of credit as the County has given nothing to the political subdivisions which is not rightly theirs.   The uncollected taxes are assets of the County as well as of its political subdivisions . . .'' and respondents cite *County of Los Angeles* v. *Payne,* 8 Cal.2d 563, 577 [66 P.2d 658] where the court quotes approvingly from *State ex rel. Barton* v. *Hopkins,* 14 Wash. 59 [44 P. 134, 550], as follows: ''Those [taxes] of the current year have been by the courts treated as a part of the

cash assets of the county for the reason that, in legal contemplation, their collection is certain . . . The legal certainty grows out of the fact that the law presumes that the taxes assessed upon the property, will be paid for the reason that the property is liable for the tax and can be sold if the tax is not paid. If this legal presumption is warranted as to taxes when they are assessed, there is no reason why such presumption should not continue until the property has been sold for the purpose of realizing the amount of taxes assessed against it.''

■ The Constitution (art. IV, § 31) says that ''The legislature shall have no power to . . . authorize the giving or lending, of the credit of . . . any county . . .'' and appellant argues that under the new system ''the county lends money to the political subdivision and may or may not thereafter receive that amount back in taxes actually collected.''

In our opinion the new system does not violate this provision against ''lending'' the credit of the county. A ''loan'' connotes an obligation to repay, but such is not the plan under this new system. It is rather a partial payment or advance on account of the share of tax money already allocated to the political subdivision which ultimately will go to such subdivision to meet its annual budget requirements. The deputy auditor characterized the transaction as an advance, whereupon the court said ''But they have the assets to back up that advance, don't they? . . . They have it assured; its prime security . . .'' The deputy testified also that in accounting practice uncollected taxes are treated as cash assets.

With respect to appellant's apprehension that the county might not get back the amount so advanced, the deputy auditor testified that the rate of tax delinquency in Contra Costa County is less than 2 per cent—approximately 1.6 per cent, and the auditor testified that since 1942-3 the delinquencies have run under 2 per cent annually; that in 1948-9 they were around 1.8 per cent and in 1949-50 around 1.7 per cent; that in 1932-3, the worst year of the depression, they ran 6½ or 7 per cent; and that immediately after the close of any year there are a lot of collections of delinquencies and by the end of the succeeding fiscal year the delinquencies become reduced by about 50 per cent. But as pointed out in the Payne case, the provisions for the sale and redemption of the taxpayer's property supply ample assurance that however long drawn-out the process may be, the county will ultimately recover

every cent of taxes advanced to political subdivisions under the new system.

We have already referred to that part of section 31 of article IV which deals with interim or emergency financing. It declares it to be the duty of the county treasurer "to make such temporary transfers from the funds in his custody as may be necessary to provide funds for meeting the obligations incurred for maintenance purposes by any city, county, city and county, district, or other political subdivision whose funds are in his custody and are paid out solely through his office."

Under the old system these temporary transfers are taken care of, as respondents point out, (a) by drafts (known in municipal accounting parlance as warrants) which are registered by the county treasurer and bear interest at 5 per cent until the fund has resources wherewith to meet them, (b) by tax anticipation warrants, and (c) by borrowing, through the board of supervisors, from surplus county funds, if any happen to be on hand.

Respondent Teeter is the author of the plan on which the new legislation was based, and it appears that his printed explanation of the plan, which was introduced as an exhibit, was before the Legislature when the bill was under consideration. He testified respecting the operation of the new system and explained how it will save much complicated and detailed accounting which has not kept abreast of the practices of private business.

From the record in this case we fail to see how there is any more danger of loss to a county under the new method than under the old.

While the appellant alleges in his complaint that the alternative method violates section 18 of article XI he makes no argument in his brief on that subject, the discussion therein being addressed only to section 31 of article IV. Section 18 provides that "No county . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof . . ." It does not appear how the alternative method violates this part of the constitution, and the court properly concluded that it does not conflict with either section 31 of article IV or section 18 of article XI.

■ Section 4702, Revenue and Taxation Code, provides that the alternative method may be placed in effect in any

county by resolution of the supervisors "adopted not later than July 15th of the fiscal year for which it is to first apply." The resolution in this case was adopted on January 3, 1950. Appellant argues that such resolution, adopted almost six months before the first day of the fiscal year 1950-51, was premature and therefore void. The statute names the date *after* which the action cannot be taken but it is silent as to how much earlier it may be done. We fail to find any irregularity in the action taken.

The judgment is affirmed.

Nourse, P. J., and Jones, J. pro tem., concurred.